Good morning. May it please the Court, James Chaney on behalf of Appellant Jason Owens. This case is an illustration of the difficulty of applying the Individualized Assessment of Disability under the ADA in the wake of Sutton, which still applies to this case, the Sutton v. United Airlines case. The facts as they affect Mr. Owens here are largely undisputed. Mr. Owens is narcoleptic. We believe that the evidence shows rather unequivocally that narcolepsy in and of itself is disabling simply because it affects virtually every aspect of your life when you have an attack. When you lose consciousness, you can't engage in any major life activity. Now, factually, what happened here is to keep Mr. Owens working, his doctor took him under treatment for narcolepsy, prescribed medication, made some suggestions about lifestyle changes, and as time went along, eventually this employer became fearful about possible side effects of one of his new medications, and deciding that they couldn't let him work while he was using this medication, they discharged him, both because he couldn't, in their view, he couldn't work while medicated, and certainly if he was unmedicated, he was unsafe because of his predilection to fall asleep, given this disabling condition. Now, the problem comes in in how we look at his medication under the various considerations under the ADA, under this individualized assessment. We've suggested at the trial court and at places in the brief that one of the ways that we could look at this medication is as an accommodation. He has a disabling condition, and the ability to take medication should be viewed as an accommodation, which would trigger an analysis and a scrutiny to make sure that this employer's concerns about the side effects of Adderall, the subsequent medication, were indeed founded. A second way to look at this, and has been discussed several times in briefs on both sides, is how this fits into the mitigation scheme. Of course, under Sutton, mitigation is supposed to be considered, and depending on how it fits into the scheme of things, it may be that mitigation is such that the person does not suffer from a disability. Now, the distinction between the Sutton case and the case here is that Justice O'Connor, in the majority opinion, speaks in terms of a disability being corrected, something that can be as simple as putting on a pair of glasses. You can see perfectly well, or perhaps with a systemic illness, if you could take a single pill at the beginning of the day and have your condition completely corrected. Narcolepsy is not that thing, and the facts show that. This was an ongoing process in which Mr. Owen's medications were being adjusted. He was also told that should he feel an attack coming on while he was working, then the employer went along with it. Your point is that even though there were two medications that helped relieve him of the symptoms, that wasn't corrective in the same sense as corrective lenses, where you can be restored to normal. The medicine couldn't take you all the way back to being the average person. Right. That's the distinction here between correction and what I would call control on a periodic basis as time goes on. Again, in Sutton, what was talked about was eyeglasses. Putting them on, taking them off, it's a simple operation. When you put them on, you are a sighted person. You are not in that moment suffering from a visual disability. Justice O'Connor uses the term correction, and it's our belief that as part of this process in looking at a mitigation to see where it falls, you have to look at the nature of the mitigation and whether it's complete. Assuming that Judge Hogan was wrong in saying he was not disabled, isn't there kind of a catch-22 situation here where if he doesn't take his Adderall, he is prone to the attacks of narcolepsy? Yes. So he is disabled. But if he does take it, he can't operate machinery. So he would ultimately, in this work environment, he would ultimately be unemployable anyway, wouldn't he, because of safety. You can't have a person on Adderall running machinery. Well, that was the conclusion certainly that the supervisor came to. What the facts show is that in reviewing a package insert, which lists the precautions and possible side effects of medication, there is a caution that you should be cautious in operating machinery. There was no prohibition. And this kind of gets into. Well, the doctor wouldn't give him a clearance to operate machinery, would he? Well, yes. Ask the doctor, and the doctor said, no, I can't give him a clearance. It's our belief that the evidence here is equivocal. I mean, when we talk about a release ordinarily in the workplace sense, where a doctor releases an employee to go back to work, normally what the meaning of that release is is my patient can go back to work and is physically capable of doing the job without further injury to that person. What these folks were looking for was not a statement that Mr. Owens could work with no danger to himself while he was taking Adderall. What these folks were looking for was a guarantee or a release that side effects would not come into play, which might create a threat for others. And this is where it leads us into the line under both ADA and the case law having to do with direct threat, which is part of where we think this case fell apart. These folks concluded that this man was a direct threat while he was taking Adderall. Under the law, it's their job at that point to quantify that and to make sure that that is really the case before they take an employment action on him, not simply to push it back into Mr. Owens' doctor's lap and say, will you sign a release? In addition to that, if you read the doctor's letter of December 20th, it is clear that he is anticipating Mr. Owens going back to work, taking Adderall, and continuing to safely operate a forklift. Now, does it include the magic words, I release Jason Owens and he will not have side effects? No, it does not. But it clearly anticipates he will work while he is taking this medication. Now, let me ask you something. It seemed to me there was some evidence that he could use the prior medication, Provigal. Provigal. Provigal. Yes. He could use that and work the daytime shift and he would not have any problems, that he only had problems when he used Provigal at night. There was an indication of that, but there was also a contraindication. While he was temporarily put on daytime work and was using Provigal, he did fairly well. Now, was this a product of being on day shift, which his doctor was recommending, or of Provigal or of both? The record doesn't answer that question because it was kind of a short trial. What we do know is that he ended up failing a medication regimen and had to be put on Adderall because of daytime sleepiness while he was at home. And that kind of illustrates the necessity of this individualized assessment that we're talking about. Disability does not fit into a box. And narcolepsy is a complex condition that requires, as apparent from Dr. Irby's letters and his affidavit, that it's a condition that requires constant work, constant monitoring, and it's an ongoing process. It's not a question that you can take a pill or put on a pair of eyeglasses and have it be corrected. It's ongoing. Well, let me ask you this. Is there a disputed issue of fact of whether Owens needed to take Adderall during the day to keep him awake? During the day to keep him awake? D-A-Y. Yeah. The record is silent on that because as far as the workplace considerations went, at that point he was on night shifts. Certainly, you know, during his daytime hours at home, he had this prescription medicine. How that affected him during the day, again, the record is silent, partially, again, because we're dealing with a fairly compressed period of time. He had just been put on Adderall within a short period before that when he was fired. With that, if I could reserve my last minute for rebuttal. Thank you. Well, what relief are you seeking? Pardon? What do you want us to do? What are you asking us to do? I'm asking you to reverse the trial court and return this to the trial court for trial on the issues and on the merits. Well, you started out by saying there were no disputed issues of fact. There were no disputed issues of fact. That's the way you started out. There were certainly disputed issues of fact. When you started out, you said that. As they affect our issues today, the fact that he was narcoleptic, the fact that his doctor says he's disabled, and the fact that he went on medication. You didn't limit it to that. You just said there are no disputed issues of fact. That's what I had to say. I expressed myself. I almost fell out of my seat when I heard that, but I didn't. I maintained calm. Again, my apologies. So, I mean, this is an appeal from summary judgment, right? Yes, it is. So tell me what the disputed issues of fact are. Isn't that the way you're supposed to approach this? Sure, certainly. I mean, there are disputed ‑‑ there will be disputed issues of fact at trial. For instance, you know, my point was as they affect the issues. The judge here granted summary judgment. Yes. And that tells us that he rendered his judgment based on the fact that there were no disputed issues of fact. Okay. Not before him at summary judgment. Now, if he was wrong about that, you tell us you ought to be able to tick off what the disputed issues of fact were. My apologies. I think I've misunderstood the Court's question. As to the issues on this appeal, as to ‑‑ That's all right. I'm generally misunderstood. Go ahead. It's not disputed that he worked there and that he was a narcoleptic and that he took medication and that he was fired as a result of that. All right. All right. But the Court says Owens ‑‑ the Court wrote, Owens claims limitations regarding his condition when he does not use medications, but there is no dispute that his condition causes no limitations when treated by medication. You seem to be arguing today that that is in dispute. That is the trial court's conclusion as to what the undisputed facts are. You're saying that's wrong. We disagree with that. Yeah, right. That is a disputed fact. That's what you're saying. That is a disputed fact. That would defeat summary judgment. If we look at the separate statements of disputed and undisputed fact in the briefs, that is not included as an undisputed fact. So what you're saying is that the judge acted as a finder of fact here by making that statement, and so summary judgment is inappropriate. Yes. Thank you. Thank you. May it please the Court. PK Runkles‑Pearson for Defendant Lumber Products. And I think I'd like to start exactly where Mr. Chaney left off with the statement, which is brand new to us for the first time in oral argument here, that there is any disputed fact as to whether or not Mr. Owens was disabled. And, in fact, if you look at the trial court opinion, which is at ER 8, the trial court found specifically that medications were completely effective to control Mr. Owens' narcolepsy. Now, that finding was not based on any weighing of the issues from one side or the other. In fact, it's based directly on Mr. Owens' own deposition testimony. Mr. Owens, at his deposition at pages 74 and 75, specifically stated that medications were completely effective to control his narcolepsy. Well, if that's true, why doesn't he have his job? Well, the issue, Your Honor, is whether or not there were side effects from the medication. And, in fact, we addressed that issue thinking that perhaps that was the issue Mr. In our response brief. You know, there are side effects from all medications. Yes, there are, Your Honor. I take my blood pressure medication. There are side effects from that. A little warning, you know, you shouldn't drive a car and all this and that. So there's no medication that are on side effects. Well, I think for the purposes of determining the case. that they put out for you to read, you're going to fall asleep anyway. So the mere fact that there are side effects, that really doesn't mean that a person who takes the medication to keep a problem under control is incapable of handling a particular job. Well, that's right. And there was some discussion about that. But what I think is important for purposes of determining whether or not Mr. Owens was disabled is his attorney's admission in the reply brief that he's not claiming that he was disabled because of the symptoms of side effects of his medication. So you have here two direct admissions. One, that he's not disabled when he's on his medication because his symptoms are completely controlled. And secondly, that there's no claim of disability when he is on his medication. Right, that the company fired him because they found that when he was on his medication or they believed when he was on his medication, he couldn't operate the forklift. That's right. What happened was the doctor presented a note, which was not a release. They had asked him to please show us that you're capable of driving this forklift on this medication. Well, he couldn't give a release. A doctor only gives a release when you're no longer suffering the underlying medical condition. He could not give a release that said that. And your client knew that he could not give a release that said that. He still, narcolepsy is a condition that's ongoing. It can be treated, but it's ongoing. Well, what the, what Lumber Products was looking for was some assurance from the doctor that he would be safe to drive a forklift. Whether or not he still had narcolepsy or not, of course he would. But whether or not, while on the medication, he was safe to drive the forklift. They got one letter from the doctor that indicated, that did not provide that assurance. They asked Mr. Owens to please go back to his doctor and come back with assurance that he was safe to drive the forklift. And Mr. Owens responded that he was not able to provide any such assurance. Mr. Chaney talks about a catch-22 for Mr. Owens, but there's also a catch-22 here for the employer. Under OSHA, the employer is under an obligation to ensure a safe workplace. Mr. Owens is driving a large piece of heavy machinery, and they want to make sure that he's safe while doing so. They have an obligation to make sure that he's safe. And so they asked for that assurance. And under the ADA, it's Mr. Owens' obligation under several prongs of the ADA prima facie case to show that he was safe to drive that forklift. The first place would be in the qualification standards. Driving the forklift. Didn't the doctor say that he could be safe if he was on the daytime shift? The doctor did. And, in fact, Lumber Products discussed with Mr. Owens the possibility of moving him to the daytime shift. And, in fact, Lumber Products had him on the daytime shift. Well, the reason that Mr. Owens was on the daytime shift was for a reason unrelated to his narcolepsy. He had had a work-related back injury and was on light duty for a period of time. And the light duty available was on the day shift. There was no daytime shift position for a forklift driver. And, in fact, there were about 35 people ahead of Mr. Owens for that positioned person who went to Lumber Products' seniority system. Under that system, the graveyard shift, which Mr. Owens was on, was sort of the lowest part of the totem pole. And then as people worked their way up through the system, they would work to swing shift and then eventually to day shift, which was a really coveted position. So Lumber Products discussed the possibility, but there was no position open on the day shift. And there were a lot of people ahead of him, even if a position had opened. So, in fact, we wanted to keep Mr. Owens at Lumber Products and tried to find various ways to do so. The day shift was one of those ways we talked about. Right. And isn't there an obligation of the employer to the extent the person is disabled that they should make reasonable accommodation? There is. There's no showing in this record that, in fact, the evidence is to the contrary, that it would be an undue hardship for Lumber Products to put him on the day shift. Actually, there is, Your Honor. I read it. I know what it says. It says that, well, we have people who have higher priority. Right. I'm not sure that's sufficient given when you have someone who's disabled under the ADA and you have an obligation to accommodate them. I mean, is that an undue hardship? Well, it's been shown there's precedent to the effect that that's not a reasonable accommodation. U.S. Airways v. Barnett, which is 535 U.S. 391, states that an employer doesn't have to go around its seniority system in order to provide a reasonable accommodation. In addition, if you look at the EEOC rules, 29 CFR 1630.2 discusses the fact that a reasonable accommodation is only an accommodation for an open position. Lumber Products isn't under an obligation to create a new position or to bump somebody else out of a position in order to move Mr. Owens to the day shift. Well, I guess I don't understand why you could do that when he had a back problem, but you couldn't do it when he had narcolepsy. That's because when you're on workers' comp because of a work-related injury, an employer can provide light duty, but light duty is only a temporary, on a temporary basis. And Mr. Owens was only there for, and the record will correct me, but it's certainly less than a few months. So it's not the kind of thing where they're creating a full-time position.  And when you have a contract with your various people and you have 35 people ahead of them, that creates a, that does create a hardship for the employer when people see someone move to the head of the line. There's no findings on that, though, in the district court opinion. He went off on that he wasn't, that the narcolepsy could be fully corrected and that, and this I think was legal error, that he could not work just a particular job as opposed to a class of jobs. Right. And I believe where the district court was going with that was whether or not Mr. Owens was substantially limited in the major life activity of working. First of all, it's important to point out that Mr. Cheney claims in his reply brief he's not arguing there was any disability caused by the medication. So to the extent that you would consider that argument, what the district court was talking about is that even if it's just one job, that's not sufficient. And the supplemental briefing that we submitted. Do you know of any job that doesn't require one to maintain consciousness? Well, there's no, no, Your Honor, but there's no issue here as to whether or not Mr. Owens was able to maintain consciousness because his medication completely controlled his narcolepsy. So the issue is looking at Mr. Owens in his mitigated state, as Sutton requires you to do, what his condition was then. No, no. Sutton is an interesting case because there, I mean, there are two people who wanted to be airline pilots and they didn't have 20-20 vision, but they could fully correct by wearing glasses. And to me that does sound like a slightly different factual scenario where he could, I mean, it didn't seem like he could fully correct. And it didn't seem that your client thought he could fully correct by taking these medicines. We were seeking assurance that the side effects of the medication, which I think are separate from whether or not he's going to fall asleep, was the issue. But I would point, Your Honor, to page 4. Yeah, you were seeking a guarantee from the doctor. And the doctor's not going to give that to you. Well, we weren't seeking a guarantee. The doctor's going to give that to you. We weren't seeking a guarantee that there would be no side effects. We were seeking a guarantee. How is the doctor going to know that? When they do these studies and they'll talk about certain side effects, I mean, those side effects might only involve a small percentage of the people. Well, we were seeking some assurance as to what those side effects even were. Well, but you've got the, there's the information that comes along with the pill. Right. And that was provided to the employer, and it states that while driving this, using this medication, you should not operate heavy machinery. And the employer was seeking some further guidance as to what that meant and as to whether this individual person was safe. Does it say you should not drive heavy machinery? Yes, it does. Absolutely. That's in S.E.R. 1, which we've submitted to you. And just in closing, I would like to finish responding to Judge Wardlaw's question by pointing you to page 483 of Sutton. Sutton itself expressly was based on the idea that if you didn't consider someone in their mitigated state, you would lose the opportunity to consider whether or not the side effects of the medication were disabling. So going back to Sutton, they acknowledged the fact that a person could be completely corrected and yet have side effects, and then you should consider whether those side effects themselves are disabling. Owens has admitted that the side effects are not disabling. So we're in a position where you're not disabled on the medication and you're not disabled off. But your client argues that they are disabling, which is why that he can't drive heavy machinery, which is a class of jobs. I want to make clear, Your Honor, that we're not arguing that they are disabling. We're arguing that we were seeking some assurance that he was safe to drive a forklift. If Mr. Owens were disabled, we wouldn't be here. If it's not safe, I don't know why it isn't disabling. Because you won't let him drive, so. Because you would have to be the same. In your client's view, he's disabled from driving. They don't want him. He's got a problem. He can't drive. Why can't I drive? You've got a disability. Well, he wasn't able to provide assurance that he could drive. But I think what's most important is that under the Thornton case. Oh, you know, there are no guarantees in life. Someone once said there are no guarantees here, nor in the hereafter. But doctors provide releases frequently saying that someone is safe to go back to work, and that's what we were looking for here. Right. But you can't release someone when they have an ongoing disease. The release means they're not suffering from the problem. Like, they break my arm. My arm heals. I'm then released. I go back to work. But even if the policy doesn't fit in that. Even if that's true, Your Honor, then the issue is whether or not the impairment constitutes a substantial limitation in the major life activity of working. And under Thornton, you would have to, the plaintiff would have had to have provided information about his skill set and about all of the jobs available in the relevant labor market. And there's no evidence in this record about that. So for that reason, even if you consider that to be an impairment, it doesn't rise to the level of a disability under this record. So what work can he do? Well, we were seeking assurance as to what he could do. But the problem is there's no evidence in this record about what Mr. Owens is qualified to do. And there's no evidence about what jobs would be available in the relevant labor market. Certainly, we believe, according to this record, he would be qualified to operate a forklift on the day shift. And, in fact, Mr. Owens requested, as Judge Wardlop pointed out, day shift as a reasonable accommodation. So there are lots of jobs in the labor market where he could operate heavy machinery on the day shift, just not at Owens. Why can he operate it on the day shift and not on the night shift? My understanding, Your Honor, is that narcolepsy hits even more strongly at night. And certainly, if you look at the – even in the complaint, Mr. Owens was accusing Lumber Products of failing to provide day shift. His doctor requested days in the letters at ER 32 and 33. And in Plaintiff's response to the concise statement of material facts and summary judgment, he specifically requested the day shift as an accommodation. So according to this record, Plaintiff is admitting that the day shift is an accommodation. And we think that's because narcolepsy hits differently on the day shift than night shift, but Mr. Owens would know that better than we did. There's evidence in the record that – medical evidence in the record that there is a difference between day shift and night shift. Well, the doctor's letters frequently request that he be transferred to the day shift so that he will not have to be on as high levels of stimulants. And the doctor repeatedly requests that. And we kept looking to see whether there was a shift open, but there was not a day shift job open. So the doctor's own letters, we believe, support that conclusion that narcolepsy hits differently from the day and the night shifts. All right. Thank you, Your Honor. Any rebuttal? What? Yeah, just get up there. First, there's a misapprehension here about what the record shows. I hear a suggestion that there was something in the literature that said that this gentleman could not drive a forklift or should not drive a forklift. The actual quote from the literature is that Adderall may impair the ability of the patient to engage in potentially hazardous activities such as operating machinery or vehicles. The patient should be cautioned accordingly. And anyone who's watched television in the last 10 years and watched the proliferation of pharmaceutical ads knows that every prescription agent virtually comes with a long list of the terrible things that might happen if you take the drug. And that's what we're dealing with here. Second, on the suggestion that it was undisputed here that this medication regimen was completely effective in regulating Mr. Owens' narcolepsy under the circumstances, the trial court, in drawing that conclusion in its opinion, cited an affidavit that included two pages of deposition testimony in which Mr. Owens was asked about his experience as to how he did under this drug. If you look at Dr. Erba's letter of December 20th, it's clear that he's anticipating that this is an ongoing process, that he still wants to see his patient go on day shift because regularization of sleep is one of the crucially important things in narcolepsy. So certainly the doctor wasn't viewing this as a situation where he'd prescribed a drug and he anticipated a complete control of narcolepsy under the circumstances. Now, what did the doctor have to say about working the swing shift? Wasn't he working the swing shift or the graveyard shift? He worked night shifts. What? Night shift, yes, graveyard. Graveyard shift. Yes. What time did he start? Pardon? What time did he start when he worked? I'm not precise. Graveyard shift is usually working in the very early morning hours. I believe, and I could be wrong. You've never worked graveyard shift? Have I ever worked graveyard shift? No. Not on a regular basis. I've pulled all-nighters, but not regularly. Well, you miss good opportunities. It was an odd, it was 8 to 2 or something like that. I looked at the shifts. It was an odd, it wasn't what I would normally think of as a graveyard shift. Again, I'm unfamiliar with that. He doesn't know. He just didn't say that. He was getting off at 4 or 5 in the morning or so, and whatever that translates into in terms of his start time, that's what shift he was working. It was certainly something that required him to try to sleep during the daytime, and I think this is what the doctor was driving at in terms of getting him on a regular schedule like we all enjoy where we sleep at night and work during the daytime. It doesn't matter what you get used to. Somewhat. Thank you. All right. This matter will stand submitted. And the next case is Livingston v. Fred Myers Scores.
judges: Goodwin, Pregerson, Wardlaw